Floor Graphics v. News America May it please the Court. Good morning. My name is Tom Beamer and I represent the appellant, Floor Graphics. I'd like to reserve three minutes of my time for rebuttal. Yes, sir. We're here on a Rule 60 motion because critical evidence not turned over in discovery was uncovered after the entry of a judgment. That evidence includes video of the video of Mr. Carlucci discussing matters directly at issue in the case that's inconsistent with his sworn deposition testimony. What was directly at issue in the case that the videos displayed? Your Honor, just focusing on the 2002 Carlucci video. And if you could tag on to that, how it was directly inconsistent? Yes, Your Honor, I will. In the 2002 video from Mr. Carlucci, you have to put the video in the context of the claims that are being made in the case. This was a claim for anti-competitive behavior between News America and Floor Graphics. Under state law? Under state law and the Computer Fraud and Abuse Act, Your Honor, which is federal law. This was a claim for anti-competitive behavior. One of the central themes in the complaint was that when News America and Floor Graphics bumped into each other in the marketplace, there was a meeting in New York City. At the meeting in New York City, Mr. Carlucci was present with the principles of my client. At that meeting, my clients alleged that Mr. Carlucci said, if you compete with News America, we will destroy you. That was a hotly contested issue in the case. In fact, it was so hotly contested that in the opening statement of the video, Mr. Carlucci was asked in the deposition if he had ever said it. He denied it, and they denied it in their opening statement to the jury. The statement was, if you compete with my client, we will destroy you. And did he say, and was he captured saying that in this video? No, Your Honor. He was also asked at his deposition if he ever discussed driving Floor Graphics out of business, if he ever discussed destroying Floor Graphics. I'm trying to get to what he said in the video. I'm going to get to it, Your Honor, but you have to put it in context in order to understand it. That's fine. Go ahead. Because what he said in the video, what he said in the video is that we have them on the run. He also said that loss of a That doesn't mean he's trying to destroy Floor Graphics. It means we've got them on the run. We're beating them. That's the nature of hardy competition. It can be, Your Honor. That's one reasonable inference from what he said. But you've got to remember that we're entitled to inferences from that communication, too. And let me just sort of go through the rest of it, and I think you'll see the connection, Your Honor. Do you have a question, Your Honor? Well, what I'm trying to do, and probably it's because I'm burdened by my record as an old trial judge, but I'm trying to envision just how this would have been used. I mean, make me an offer approved. Okay, Your Honor. In the video, he specifically references two contracts, two customers, Kroger and Safeway. Specific allegations in the complaint was that they tortiously interfered with our contract with Kroger and our contract with Safeway. Those conversations are specifically referenced in the video. Which conversation? He's talking about News America defeating Florographics for the Kroger contract and for the Safeway contract. And he also says something else, Your Honor, that's very relevant. I'm sorry. Did he say defeating Florographics with respect to those? Your Honor. Was that his words? What he said specifically is he said on Kroger, as Marty talked about yesterday, Marty is Marty Garofalo, another senior executive vice president of News America. The loss of Kroger was overwhelming to Florographics. Sounds very innocuous to me. I don't know why. Well, Your Honor, don't forget, we asked him specifically at his deposition, did you ever discuss FGI going out of business? Now, after he says the loss of Kroger was overwhelming to them, he says specifically they had gone out and sold it to their investment bankers and we have them on the run. Then he says, then he says, Your Honor, with respect to Safeway, lack of success with Safeway core products has hastened their appetite to sell. To sell out. To get out of business. I'm going to say the same thing Judge Fuente said to me. It sounds relatively innocuous to me. It's an account of how the competition is perceived right now and now trying to put on the hat of a trial judge before whom you're going to offer this evidence, before whom you want to offer this evidence, as I assume in that proffer I asked for, that it's to demonstrate inconsistency? No, Your Honor. It's to demonstrate it's discoverable. Don't forget, we're talking about a document. Sir. If it's discoverable, particularly at this stage of the game, post-judgment, you better be showing us that you intend to use it for some purpose. That's not correct, Your Honor, and I'll explain why. Under Rule 60B-3, it's clear that... Under B-2, however, which you've also argued you would have to demonstrate. Absolutely, Your Honor. Under B-2, we have to show it's result altering. But under B-3, all we have to do is show that the document would have been useful in cross-examination. That's the Siebold case. All right. So going back to what I said a moment ago, cross-examination, how would you be using it for cross-examination? This is how we'd be using it, Your Honor. We would put Mr. Carlucci's deposition testimony up on the video, and we would show where we asked him specifically, did you ever discuss floor graphics going out of business? Then we'd put up the testimony on the video that shows him saying that we have them on the run. They've hastened their appetite to sell. Under what federal rule of evidence are you seeking to bring this in? Your Honor, it's a statement of a party opponent. He's the CEO and chairman of the company. It's not hearsay. It's absolutely relevant to the case. I didn't raise hearsay. I'm asking you. This is the proffer you'd have to make. Absolutely, Your Honor. This is the chairman and CEO of the company who was alleged to have said he's going to drive our company out of business, who's talking in front of the senior executives of the company, who's talking about having us on the run. But then he says, Your Honor, then he says, I'm glad the lawyers are here because he didn't really say it. And then in his deposition, when we asked him, did you ever discuss it? Did you ever discuss them going out of business? He said no. All right. That's prior inconsistent statement, isn't it? That's correct, Your Honor. All right. What does it add? I mean, Judge Thompson was not impressed at all by this adding anything to what she, as the trial judge who heard it all, had heard and which apparent, some of which is the conversation you've alluded to that did occur between the principles was some substantial evidence. But she didn't seem to think that what she wanted to add to it really contributed anything. Your Honor, she made two mistakes in doing that, and she abused her discretion in two ways. First, there is also the reference in the tape when he says, as Mr. Carofalo discussed yesterday with respect to Kroger, the case law in this area on 60B3 says that if we can show that it would have led to other meaningful discovery requests, that's sufficient to show that it interfered with our ability to fully and fairly present our case. As a trial attorney, there's no trial attorney in the world who, when they saw that videotape, would have asked about that previous conversation with Mr. Carofalo. That deals with one of the contracts that was directly at issue in the case, the Kroger contract. No trial lawyer in the world would have said, I want to know if there's a video of that conversation. We still don't know to this day if there's a video of that conversation. We asked the trial court, let us see the videos. We were denied the opportunity to see the videos. Some of those videos were beyond the discovery order that Magistrate Judge Hughes had issued in your case. You're talking about the April 11, 2006 cutoff, Your Honor? Yeah, exactly. But you're mentioning videos generally, but some of those were excluded. Some of them may have been beyond. And some of them were under a seal order. Yes, Your Honor, in the Michigan case. But the Carlucci video was in 2002. But weren't the others you referred to, what you may not know, what you may not have received, weren't there a number of videos, maybe five that were actually created after the discovery cutoff? Well, Your Honor, there were four or five that were created after the alleged discovery cutoff. What we know, though, is that the 2002 video in Mr. Carofalo's statement was created before the discovery cutoff. We were also able to ascertain from the trial exhibit list in Michigan that there were a number of other videos that mentioned FDI that weren't produced. What was sought in the request for production number 20? Your Honor, what was sought specifically in request for number 20 were all communications related to FDI. There's no question that the Carlucci video, where he specifically says on FDI and talks about the specific contracts at issue in the case, that that request encompassed the video. In fact, at the district court level. All right, so how did they get to number 20? News America gave an objection to the extent it sought documents that were covered by the Privilege of Work product. They haven't alleged that the Carlucci video is covered by Privilege of Work product. Then they objected that it was overbroad, because they said sometimes they mentioned FDI in a way completely unrelated. And you were not involved in the litigation at that stage, is that correct? You were not counsel? No, Boy Schiller was counsel, but they're on the briefs with us. So what did they do? Your Honor, they didn't just object. They then answered in their response, they said they will produce documents under this request to the extent related to the allegations. So what did your predecessor representing FDI do? Your Honor, they relied on that representation from a point in time. Surely they realized that nothing had been produced. What action was taken? That's not true, Your Honor. They produced a million pages of documents. What we didn't know was that they didn't produce the videos. And the videos are clearly related to the allegations in the complaint. He's talking about two of the very contracts that we allege they interfered with, the Kroger contract and the Safeway contract. Well, what did they do to interfere with them? It's competition. I thought that competition in the capitalist system, you want to grab all the business and you put your competitors out of business. Your Honor, you're right. There's a fine line between fair competition in the marketplace and crossing over that line to unfair competition and tortious interference. What was the unfair competition? With respect to the Safeway contract and the Kroger contract, Your Honor, what was alleged in the complaint was thought to be proved is that they were lying about the number of CPG consumer product companies that they could service. And they misrepresented that in order to steal the business. You know, I noticed when you signed the release, you released concealed claims too. Your Honor, that's correct. The release... Concealed claims. It's like you were, you know, I had a feeling that, gee, they were really trying to wrap this up. There's no question they were trying to wrap it up, Your Honor. But under the rule, under Rule 60B-3, we were entitled to rely on their honest, truthful and complete answers to discovery. That's Your Honor's Everback case. When you say concealed claims, then it's almost as if you anticipate that there may be claims that they haven't told us about. That's why it's concealed. Your Honor, under New Jersey and New York law, one of which is going to apply to that release, in order for a release to be exculpatory, to get you out of your own wrongful conduct, it has to be extremely specific. And we cited cases to the district court that explained the difference between a specific release and a general release. The language that's used in this particular release is very general. It is not specific enough under New York and New Jersey law. The lower court didn't reach that issue. It was dismissed as moot because she didn't have jurisdiction. I understand Your Honor's question, but it's really not in front of the court. Thank you. Mr. Abrams. Good morning. May it please the court, I'm Lee Abrams, representing the Appalese News America Marketing In-Store and News America Marketing In-Store Services. Clearly, Judge Thompson did not abuse her discretion. She made factual findings with respect to the relevance and significance of the rule 60B motions. She said, I've been involved in this case for a long time. I watched these witnesses and I don't see that this is any big deal. This isn't the game changer within the meaning of rule 60B-2. It's not outcome determinative. Mr. Abrams, should the videos have been produced, were they not discoverable? I don't think they were encompassed by the discovery as we objected, Your Honor. We objected and said... Well, the magistrate judge had a cutoff for production of either discovery of the videos, but there were items that were generated before the cutoff date. Some of these videos fit into that. Some of them do, and indeed the Carlucci video, which we've encouraged the court to watch, it's only a minute long, and we quoted it in total at pages 35 and 36 of our brief. That's right, but my question was, was it not discoverable? Should it not have been produced?  Why not? In response to number 20, to request for production of documents number 20, why did it not come under... It came under the request, Judge Smith, but it did not come under the response. Didn't news respond that it would produce non-privileged, responsive documents related to fluorographics allegations? Relating to the allegations, Your Honor, that is the distinction we drew. And Ms. Green, Kelly, and I drew that distinction expressly because we said we've got millions and millions of communications in this day of e-mail within the company that mention our competitor. Merely mentioning the name of a competitor doesn't make it relevant. But this does more, doesn't it? Because you have Carlucci talking about FGI's contracts with Kroger and Safeway, don't you? That's the context in which you always mention your competitors. You say, they beat us on this contract. We beat them on that contract. There's millions of pages of that. The allegations in the complaint were relating to misconduct, tortious interference, defamation... Tortious interference with contracts. Yes, and there's nothing in this video that has anything to do with tortious interference with those contracts. In Safeway, for four years, Fluorographics had an exclusive contract with Safeway. They beat us. Then, at the end of that contract, there was another competition, and we beat them. And the Garofalo speech to the same sales conference was also discussed in Fluorographics briefs. Garofalo said, we're very happy. We won the Safeway contract. Well, if the jury had the benefit of seeing the video, if it had been produced, could it not infer, based on the statements Mr. Carluccio made, that News America interfered with its Safeway and Kroger contracts? On the contrary, Your Honor. I don't think there's anything in that video that suggests anything tortious or unfair about the competitive process related to either the Safeway contract or the Kroger contract. We competed against them, and on these two, we won. And that's good news. And he also testified in his deposition, which Mr. Beamer didn't mention, he testified about how the Fluorographics executives, with their investment banker, came to News Corporation and said, will you buy us? Here is our presentation. That's at pages 112 to 114 of the same deposition where Mr. Beamer says he concealed the fact that they were looking to sell their business. He didn't conceal it. He testified about it. We produced documents about it. It was no secret that Fluorographics was trying to get News to buy its business. That had nothing to do with the question of anti-competitive conduct that was alleged in the complaint. There is simply a mention in these various videos, there's a mention of Fluorographics. And in our objections, we said we're not producing every piece of paper that mentions their name. We're producing documents relative, relevant to the allegations. Magistrate Judge Hughes oversaw the discovery. Wasn't it the request for discovery to disclose videos or tapes or documents in which Fluorographics was discussed? I think not, Your Honor. It was a broad request, wasn't it? That was within the request. But as we objected, we said, we're not producing every piece of paper that mentions them and every video that mentions them. That's burdensome. So what, if anything, did FGI do between your objection and the close of discovery, or for that matter, prior to trial, to seek a court ruling or otherwise get you to produce that which you had objected to? On that one, they did nothing further. On many others, they moved to compel. On some of those motions to compel, Judge Hughes ruled in their favor, and we then produced what he ordered us to produce. On others, he denied their motions, and we didn't produce them. There were eight sets of document requests. There were 20-odd depositions, including depositions of the Safeway person and of Mr. Garofalo about the competition for the Safeway contract. All of this was explored in painstaking detail between 2004, when the case was filed, and 2008, when we went to trial. There was unbelievable quantities of material produced, and what we have here in this proceeding, floor graphics says, we would like not just to have the judgment set aside, we'd like to reopen discovery. The motion before Judge Thompson said, we'd like to get the five and a half million pages of paper that you produced in discovery in the Velazquez case, another case. Now, we had objected to that, and they hadn't moved to compel. They said, we also want the budget books. On that one, they moved to compel, and Magistrate Judge Hughes denied the motion. And Rule 60B says, you reopen a judgment upon the showings that are articulated in 60B2 material that could have been obtained by the exercise of reasonable diligence and would be outcome changing, a game changer. Judge Thompson, who was very familiar with this case, watched the video, and that was the one, there were a dozen videos that were referred to in the floor graphics motion. That was the prime poster child that Mr. Beamer chose to put on the screen for Judge Thompson to watch, and she watched it. Mr. Abrams, in Rosebud v. Sioux Tribe, are you familiar with the case? Yes, Your Honor. The 8th Circuit reversed a key witness' testimony, or because a key witness' testimony was contradicted by testimony that he gave later. Yes, Your Honor. Why isn't that case pretty much on all fours with this case? Because there was clear perjury when you compared the two pieces of testimony. That was the Native American individual, Lone Dog, as I recall. Yeah, the chief of the tribe. And that was a clearly perjurious situation that occurred. Yes, he was the chief of the tribe, and his testimony was flat-out inconsistent. We have set out the testimony that Mr. Carlucci gave in his deposition that floor graphics relies on as allegedly inconsistent and quoted the entire video at pages 35 and 36, and I submit there's not any inconsistency, there's not any evidence of perjury, and here we have, recall, a stipulated judgment of dismissal. And the lawyers who participated in all of that discovery and in all of that proceeding have not come forth to say, gee, we were duped in the discovery process. They hoodwinked Magistrate Judge Hughes. All of this stuff was really important. It isn't remotely important enough under the cases in this circuit, particularly the talk about the extremely high burden to set aside a judgment, and in this case a stipulated judgment of dismissal. There are some videos that haven't been disclosed yet for which there has been a request to disclose. Can you comment on those? I understand they have to do with the Velazquez litigation. And they're not, to the extent that they only relate to Velazquez, they don't have anything to do with this case. But they don't know that. Well, they asked for every piece of paper and every video that was produced in discovery in the Velazquez case. We objected to that and said that's ridiculous. That's a different case involving different lines of business. It involves antitrust claims. Was that subject to a further motion to compel discovery? It was not, Your Honor. The mere fact that certain documents and videos were covered by different discovery requests in a different litigation involving different statutes in a different industry doesn't make them relevant here. When you say different industry, does Velazquez offer a different product or service? Yes, Your Honor. From that which FGI offers? Yes, Your Honor. Does Velazquez offer these kinds of inserts? Yes, the Sunday newspaper supplements is what Velazquez does. And the competition between News America Marketing Exhibit A. News America Marketing and Floor Graphics compete in the in-store business, shelf advertising, coupon dispensers, decals on the floors in supermarkets and chain drugstores and stores like Kmart, but not this Sunday supplement coupon to which Your Honor refers. That's a different industry. So the fact that different discovery occurred in a different case doesn't make those materials relevant here. But I come back to the proposition that the most exciting thing that Mr. Beamer showed to Judge Thompson doesn't prove anything in the way of an inconsistent statement or perjury or misconduct. What was the most exciting thing? The Carlucci video in which he says, We've got them on the run. We beat them at Safeway. We beat them at Kroger. But you're not talking about what was presented in the trial itself. No, at the trial, we had a week of trial, Your Honor, and then Floor Graphics decided it wanted to sell its business to News America Marketing. And as Judge Thompson observed in the transcript from last year, they got a very good price for their business, and it was negotiated between the exceptional counsel who represented Floor Graphics at that time and the mere fact that Velasquez settled for more was not a reason to set aside this judgment. At trial, did the conversation that took place between Mr. Carlucci and was it Mr. Reb? Yes. That came out during trial where Mr. Reb testified about it, Your Honor. I'm the guy who made the opening statement to which Mr. Beamer referred in which I said they claim that at a restaurant in 2000 or thereabouts, Mr. Reb and his brother were talking to Mr. Carlucci and Mr. Porco, the senior executives, and Mr. Carlucci made this threat. Mr. Carlucci denied that that happened and he did not get to testify because only part of the plaintiff's case came in before Floor Graphics decided. So that's the only thing the jury had at that point? The jury heard Mr. Reb. Was your opening statement on that issue? No, they heard Mr. Reb's testimony that it occurred. All right. And they heard the testimony of Gary Henderson. So is that at least in part what Judge Thompson was referring to during the Rule 60 hearing as I don't recall her exact words but as a reason for why she wasn't overwhelmed by what she heard and saw in the Carlucci video, that trial had involved these significant threats, if you will, or allegations of threats, and that do I recall her suggesting that this didn't really add much to the evidentiary scheme at that point? Yes, I think her conclusion was this didn't change anything that she had heard previously. But Mr. Carlucci did not testify in the trial before it ended. He was going to, and it was on that basis that I had made the remarks I did. Thank you, Mr. Reb. Thank you, Your Honor. Mr. Beamer? Mr. Beamer, you know the impression I do get, and maybe you can amplify it a little bit, is that this discovery that you did not get is really a game-changer for you, that if you were to have it and go back, you would maybe get a different result. Could you comment on that? Yes, Your Honor. First of all, under Rule 60b-3, it specifically does not have to be result-altering. This Court in Seabolt said it, Rozier said it in the Fifth Circuit, Anderson said it in the First Circuit. Rule 60b-3, but it is required for B-2. It is under B-2. But as Your Honor rightly pointed out, inconsistent statements by a key witness under oath does satisfy the B-2 requirement. So the question becomes, would we have been entitled to a reasonable inference that what Mr. Carlucci was saying in his deposition was inconsistent with what he said on the videotape, particularly in light of the fact that he said he was going to deny it and he was glad the lawyers were in the room. You know, there was a difference. In the Rosebud case, there was a perjury involved. In your case, you're talking about inconsistency. So the two instances are a little different. But it's inconsistent statements under oath in his deposition, Your Honor. At his deposition, he said he never even discussed FGI going out of business, never even discussed it. This is him in front of the entire senior executives of the company, saying we have them on the run, hasten their appetite to sell, and I'm glad the lawyers are here because, shh, he really didn't say it. And the problem with this argument is News America is going to spin this videotape their way. If they had done the right thing, if they had given it to us, we would have had the opportunity to use the video to create our own set of inferences. That's the way it's supposed to work. They're not supposed to make a unilateral determination that this video is not material to our case so they don't have to give it to us. We asked for communications related to FGI. They said they would give us those documents related to the claims, if any. This court over and over and over again, and Bob and Morales and Park, has said the words related to are to be interpreted broadly. We had a right to rely on that representation from them. And when they didn't give us that document, they undermined the integrity of the process, and they did more than that because that document specifically references another conversation. And that really would fit into your B-3 argument. Correct, Your Honor. The integrity of the process as opposed to whether something is a game changer or not in terms of its weight. Correct, Your Honor. I am focusing on B-3. The B-2 argument hinges on whether or not we were entitled to a reasonable inference that no reasonable juror could believe that Mr. Carlucci's deposition testimony, where he denied ever discussing FGI going out of business, was inconsistent with his video testimony, videotape, where he said we have them on the run and we hasten their appetite to sell. I believe that is a reasonable inference from that, because we're going to deny we said it. I believe that's a reasonable inference under those circumstances, and what I really believe is that we were entitled to that document so we could have made that argument. Thank you. Very good, Mr. Deamer. Thank you very much. Mr. Abrams, thank you. We'll take the case under advisory.